IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 16-cv-01703-MSK

ESTATE OF JOSEPH VALVERDE, by and through ISABELLE PADILLA, as
representative and next of kin of the decedent.

Plaintiff,

v.

JUSTIN DODGE, and
The CITY AND COUNTY OF DENVER, COLORADO

Defendants.

---

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff, Isabelle Padilla, as acting representative of the estate of Joseph

Valverede, and next of kin of the decedent, by and through her attorneys, hereby

oppose Defendants' Motion for Summary Judgment as follows:

### INTRODUCTION

On July 2, 2014, Joseph Valverde ("Decedent") was shot and killed by Justin

Dodge of the Denver Police Department SWAT Team, at Overland Public Park, located

in the City of Denver, Colorado.  Decedent was fatally shot during a "reverse drug bust'

in which Decedent was purchasing 2 kilos of cocaine from an undercover officer

("UC") whom Decedent believed was his friend, and not a law enforcement officer.

Decedent was unarmed with his visibly empty hands up near his head, indicating his

surrender and in compliance with the officer's command to show his hands, at the time

of the shooting.  Further, the involved officers arrived in an unmarked van and they did not identify themselves as law enforcement prior to the shooting, nor was a verbal warning that deadly force would be used given prior to the shooting, despite it being feasible to do so.

Dodge shot Decedent a total of 3 times, with the bullets striking Decedent in the chest, back, and in the elbow.  This shooting was captured on video (without audio) by an FBI plane which monitored the reverse drug bust in real time and transmitted the video feed to the primary arrest team in the van which was driven by Dodge. Moreover, there was an audio recording of the incident which was captured by a recording device worn by the UC.  Therefore, any audio heard on the video of the shooting was added after the fact by trying to sync the video with the audio recording.

The Court should deny Defendants' Motion for Summary Judgment with respect to the use of deadly force by Dodge against the Decedent because there are triable issues of material fact regarding the excessive force claim under the Fourth Amendment.  As discussed further below, and as indicated in the declaration of police practice expert Roger Clark, filed concurrently herewith, the use of deadly force was excessive and unreasonable in this case for several reasons, including but not limited to, Sergeant Dodge and/or the other 5 SWAT Team members in the van with him, never identified themselves as being law enforcement prior to the shooting, despite it being feasible to do so and despite the involved officers arriving in an unmarked van.  In fact, Decedent's last words were "who's that" because he did not know who that was that was arriving in the unmarked van.  Further, a flash bang device was deployed prior to

the shooting which is designed to confuse, disorient and surprise a suspect.   Moreover, the involved officers were wearing green uniforms, whereas Denver PD patrol officers wear blue uniforms and even witness Sarah Fidler could not identify them as law enforcement prior to the shooting.   Further, Ms. Fidler and her dog were in the background/backdrop of Dodge's gunfire and thank God there were not more fatalities. [Declaration of Roger Clark, attached as Exhibit "F" to Valenzuela Decl. at ¶ 11.] Decedent complied with the officer's command to put his hands up.  After Decedent removed a handgun from his short's pocket, he immediately discarded the gun on the ground and raised his visibly empty hands near his head, in compliance with the officer's command put his hands up.  An individual putting his empty hands above his head is a universal signal to law enforcement indicating that the suspect is surrendering, especially when he is given a command to do so.  Decedent never pointed the gun at anyone, including Dodge, nor did he attempt to shoot anyone with his gun.  Dodge did not give Decedent a verbal warning that deadly force would be used prior to the shooting, despite it being feasible to do so.  None of the other 5 SWAT team members, who were faced with similar circumstances as Dodge, ever fired a shot at Decedent and many of them never even un-holstered their guns, which shows that a reasonable officer under similar circumstances would not have shot Decedent.  [Ex. F – Clark Decl. at ¶ 12].

Decedent never verbally threatened anyone, he never attempted to flee and was not resistive or combative, there were 5 additional SWAT team members to assist Dodge, in addition to extra nearby officers already on scene acting as perimeter and

cover for the primary arrest team so Decedent was not going to escape anywhere (even though he never attempted to escape).   Further, Sergeant Dodge and the other SWAT members suspected that Decedent might be armed because Decedent had indicated that he was armed during their prior transactions and suspects routinely discard guns to avoid being caught with them by law enforcement and law enforcement are well aware of this common occurrence.   Moreover, Decedent never attempted to rob, assault or injure anyone in the previous 3 transactions with the UC.

Based on the gunshot wounds, Decedent was not even facing in Dodge's direction for some if not all of the gunshots, and Dodge had cover from the car located in between himself and Decedent at the time of the shooting.  Further, after making the decision to shoot at Decedent, Dodge had time to reassess the need to use deadly force prior to pulling the trigger.  Moreover, Dodge had numerous less-than-lethal options that would have been feasible to use during this incident including the 40mm gun to which he was actually assigned per the tactical plan, there was a K-9 on-scene, there were approximately 6 additional officers nearby to assist Sergeant Dodge in taking Decedent into custody, as well as two additional cars, with 2 officers in each car, providing perimeter and cover, Dodge could have taken cover behind the car that was in front of him and in between himself and Decedent, Dodge could have given a verbal warning that deadly force would be used prior to shooting, Dodge could have identified himself as law enforcement and given Decedent commands (which he gave none) to drop the gun (which Decedent already did voluntarily prior to the shooting) or given Decedent more time to comply with the commands already given.  Especially since

Decedent already had complied with another officer's commands to put his hands up prior to the shooting, and was in compliance with said command at the time of the shooting.

As the supervising officer on-scene, Dodge was reckless for failing to follow a competent tactical plan for conducting the reverse buy-bust operation. Dodge had bad pre-shooting tactics including failing to follow the tactical plan. Dodge's primary responsibilities in the tactical plan were to drive the van and provide less-than-lethal coverage with the 40mm. In fact, 3 different SWAT team members (Bollwahn, Gruenther, and Moen) indicated that they did not even know that Dodge had gotten out of the van and placed himself in between the two primary contact teams, which also put Dodge in the direct line of fire and in a cross-fire position. Further, there was an officer behind Decedent at the time of the shooting, who was also in the line of Dodge's gun fire. Moreover, it was bad tactics to allow Ms. Sarah Fidler and her dog to enter the area where the buy-bust was going to occur and she was also in the background/backdrop of Dodge's gunfire. Accordingly, Dodge was also not justified in his use of deadly force against Decedent because of his own apparent willful reckless actions that needlessly provoked a sequence of events leading to the catastrophic fatal shooting of Decedent (who was not armed when he was shot). [Ex. F – Clark Decl. at ¶ 13]. Further, based on the medical forensic evidence, Decedent was going to the ground or on the ground for some of the gunshots, Decedent was not even standing upright and facing in the direction of Dodge for at least some of the gunshots which struck and entered into Decedent's back and into the back of his elbow.

## CLAIMS AND DEFENSES UPON WHICH SUMMARY JUDGEMENT IS SOUGHT

**A.   Sergeant Dodge is Not Entitled to Summary Judgment On Claim 1: Excessive Force in Violation of the Fourth Amendment**

1.   Burden of Proof and Elements

Plaintiff generally agrees with the Defendant's recitation of the burden of proof and elements on this claim.  However, Defendants' burden of proof and elements is incomplete because it does not include the proper standard to apply to the evidence. An assertion of qualified immunity does not permit the Court to resolve genuine disputes of material fact in favor of the defendants.  *Tolan v. Cotton*, 134 S.Ct. 1861, 1866 (2014).  Like with all motions for summary judgment, the Court's role is to assess the sufficiency of the plaintiff's evidence rather than its believability.  In this regard, when ruling on a qualified immunity motion, the Court adopts the plaintiff's version of the facts.  *Id*.  In determining whether a plaintiff's constitutional rights were violated the Court ordinarily adopts plaintiff's version of the facts, insofar as it is supported by the record.  *Thomas v. Salt Lake*, 584 F.3d 1304, 1318 (10th Cir. 2009) (internal citations omitted); *see also Walton v. Gomez (In re Estate of Booker)*, 745 F.3d 405, 411 (10th Cir. 2014) ("When the defendant has moved for summary judgment based on qualified immunity, we still view the facts in the light most favorable to the non-moving party and resolve all factual disputes and reasonable inferences in its favor.").

Plaintiff further disputes the Defendants' statement of the burden of proof and elements with regard to qualified immunity. Specifically, the Defendants' Motion conveniently omits the sliding scale which has been adopted here in the Tenth Circuit,

and the Plaintiff denies that she is required to identify a case directly on point in order to defeat the Defendants' claim for qualified immunity.   In an obvious case, the *Garner* and *Graham* standards can clearly establish that a use of force is unlawful, even without a body of relevant case law.  *See Hope v. Pelzer*, 536 U.S. 730, 738 (2002), *citing Brosseau v. Haugen*, 543 U.S. 194, 199 (2004).  Nothing in *Mullenix v. Luna*, 136 S.Ct. 305 (2015) overruled *Hope* on this point.  Building on the Court's decision in *Hope*, the Tenth Circuit's decision in *Casey v. City of Federal Heights*, decided almost three years after *Brosseau*, explained that "[t]he Hope decision shifted the qualified immunity analysis from a scavenger hunt for prior cases with precisely the same facts toward the more relevant inquiry of whether the law put officials on fair notice that the described conduct was unconstitutional." 509 F.3d 1278, 1284 (10th Cir. 2007) (internal quotation marks omitted).   The *Casey* Court explained that "[w]e therefore adopted a sliding scale to determine when law is clearly established," *id.*, stating that although alleged rights violations must be analyzed at the proper level of generality "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."  *Id.* (quoting *Pierce v. Gilchrist*, 359 F.3d 1279, 1298 (10th Cir. 2004)).  The degree of specificity required from prior case law depends in part on the character of the challenged conduct.  *Pierce*, 359 F.3d at 1298.  However, it is not necessary for the precise conduct of the defendants to have been previously held unlawful—it is enough if preexisting law gave the defendants fair warning their conduct violated the law.  *Hope*, 536 U.S. at 741 (stating "officials can still be on notice that their conduct

violates established law even in novel factual circumstances;" while "earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding") (quotations omitted).  Thus, when an officer's violation of the Fourth Amendment is particularly clear from *Graham* itself, the Court does not require a second decision with greater specificity to clearly establish the law.  *See Casey*, 509 F.3d at 1284 (citations omitted); *see also Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008) ("We do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself").

In most cases, the general deadly-force standard elucidated in *Graham* is not sufficient to put an officer on notice of the "clearly established" law.  *Brosseau*, 543 U.S. at 199.  However, there exists a "narrow exception" which permits the plaintiff to show that "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of case law."  *Martinez v. New Mexico Dep't of Pub. Safety*, 47 F. App'x 513, 516 (10th Cir. 2002) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1199 (11th Cir. 2002)).  Since excessive force jurisprudence requires an all-things-considered inquiry with "careful attention to the facts and circumstances of each particular case," *Graham,* 490 U.S. at 396, there will almost never be a previously published opinion involving exactly the same circumstances.  Courts cannot find qualified immunity wherever we have a new fact pattern. *See Anderson v. Blake*, 469

F.3d 910, 914 (10th Cir.2006) ("[A] general constitutional rule ... can apply with obvious clarity to the specific conduct in question, even though [such conduct] has not previously been held unlawful." (internal quotation marks and alteration omitted)).  The Supreme Court or Tenth Circuit authority need not be square on all four corners, *see Anderson v. Creighton*, 483 U.S. 635, 640 (1987), and "a plaintiff need not present an identical case to show the law was clearly established." *Sutton v. Utah State Sch. for Deaf & Blind*, 173 F.3d 1226, 1241 (10th Cir. 1999).  A case with "exact corresponding factual circumstances" is not necessary; defendants are required to make "reasonable applications of the prevailing law to their own circumstances." *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (internal quotation marks omitted); *see also Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (acknowledging that a plaintiff's right to be free from excessive force may be clearly established even in the absence of prior similar case law if the plaintiff makes a showing that the conduct was "obviously egregious ... in light of prevailing constitutional principles").

2.    Elements Challenged by the Defendants

Element 1:  The Plaintiff can demonstrate a triable issue of material fact as to whether Dodge's use of deadly force against Decedent was reasonable and in violation of the Fourth Amendment.

A.    There are numerous disputed issues of material fact.  Defendant lists numerous facts which he alleges are "undisputed material facts relevant to the totality of the circumstances."  See Def.'s Motion at 7-12.  However, contrary to Defendant's motion, many of these facts are highly disputed and there are also

additional disputed issues of material fact not identified in Defendant's Motion. Because there are numerous disputed issues of material fact, Defendant's motion should be denied on this ground alone.  See Fed. R. Civ. P. 56(c) (Summary judgment cannot be granted where a genuine dispute exists as to "material facts.").  These facts, identified by the Defendant as undisputed, include whether Decedent complied with the officer's command to show his hands.  Defendant falsely claims that Decedent did not comply with the officer's command to show his hands. See Def.'s Motion at 2. However, first off, Decedent was never given the command to "show his hands". Instead, Officer Matthews gave the command to "put your hands up".  [Ex. A – Video Recording of the Shooting at 13:39:13-13:39:30; Ex. B – Enhanced Video of the Shooting 00:14-00:17; Ex. C - Matthews Depo. at 108:18-109:3, 110:25-111:6 ].  After having voluntarily discarded his gun onto the ground, Decedent put his visibly empty hands up near his head in compliance with the officer's command to put his hands up and had his hands up near his head when the shooting began.  [Ex. A – Video Recording of the Shooting at 13:39:13-13:39:30; Ex. B – Enhanced Video of the Shooting 00:14-00:17; 01:00-2:30].  In other words, the officer commanded Decedent to put his hands up, and after said command was given, Decedent did in fact put his visibly empty hands up near his head, and then Dodge began firing at Decedent while he was in this position.  If an officer gives a command to "show your hands" or "put your hands up" and the individual puts their empty hands in the air near their head, then they are complying with said command.  [Ex. D – Moen Depo. at 96; Ex. E – Bollwahn Depo. at 59; Ex. F – Clark Decl. at ¶ 14]].  When the evidence is viewed in the light

most favorable to the Plaintiff, and taking all reasonable inferences therefrom, the officer(s) ordered Decedent to "put his hands up" prior to the shooting and Decedent complied with this command by putting his visibly empty hands up near his head prior to the shooting, and then Dodge started shooting Decedent while he was in this position.  Therefore, there is a material factual dispute as to whether Decedent complied with the officer's command to put his hands up prior to the shooting.

There is also a material factual dispute as to whether Decedent ever pointed the gun at Dodge and whether Decedent was pointing a gun at Dodge when he was shot. Defendant's motion indicates that Dodge saw the muzzle of the gun coming in his direction and immediately fired 5 times until Decedent went down to the ground.  *See* Def.'s Motion at 12.  However, Defendant's version of the facts conveniently omits that Decedent voluntarily discarded his gun onto the ground and raised his visibly empty hands up near his head in a universal sign of surrender, prior to the shooting and was in this position when Dodge started to shoot Decedent. In Dodge's interview with investigators, which was taken on July 2, 2014, the same date as the incident, Dodge claims the following: that he saw Decedent with a gun in his hand, that Decedent moved his wrist and made the muzzle of the gun come up in Dodge's direction, that is when Dodge shot Decedent, and after shooting the Decedent he immediately went down to the ground and as soon as Decedent went down, Dodge saw Decedent's gun pop out and Dodge stopped shooting because he saw the gun pop out. [Ex. G – Dodge Int. at 40:16-41:22; 42:23-43:7; 44:6-22; 47:12-25].  In other words, Dodge claims that he sees Decedent with a gun in his hand, Decedent moves his wrist and the muzzle of

the gun up in Dodge's direction and Dodge shoots Decedent as Decedent is pointing a gun at Dodge or about to point a gun at Dodge, and then after Decedent is shot and on the ground, the gun popped out of his hand – which caused Dodge to recognize the weapon coming loose and stop shooting.

However, Dodge's version of the shooting is highly disputed and directly contradicted by the video recording of the shooting.  The video recording of the shooting clearly shows that Decedent *never pointed a gun* at Dodge or any other officer, that Decedent voluntarily discarded the gun onto the ground (while he was standing up) and then raised his visibly empty hands up near his head (all in one motion) prior to the shooting and that Decedent was in this position when the shooting began.  [Ex. A – Video Recording of the Shooting at 13:39:13-13:39:30; Ex. B – Enhanced Video of the Shooting at 00:50-2:30].  The video recording of the shooting does not show Decedent with a gun in his hand when the shooting occurs, let alone Decedent with a gun in his hand and a muzzle coming pointed up and in the direction of Dodge at the time of the shooting. *Id.* Further, the video does not show the gun popping out after gun shots and after Decedent went down to the ground.  *Id.* Apart from the video recording of the shooting, there is additional evidence that Decedent never pointed a gun at Dodge or anyone else and that Decedent's hands were empty at the time of the shooting.  [Ex. H – Brown Depo. at 14:6-11, 29:10-14, 34:3-6, 43:5-8; Ex. C – Matthews Depo. at 127:13-15, 128:16-25; Ex. D – Moen Depo. at 75:16-76:14]. When the evidence is viewed in the light most favorable to Plaintiff and taking all reasonable inferences therefrom, Plaintiff voluntarily discarded his gun onto the ground

and put his visibly empty hands up near his head (in one motion ) prior to the shooting and was in that position when Dodge started shooting Decedent. *Id.*  Decedent did not have a gun in his hand when the shooting began, Decedent never pointed a gun at anyone, the muzzle of the gun was not coming up in Dodge's direction at the time of the shooting and Decedent's gun did not pop out from his person after he went down to the ground after the shooting. *Id.*  Therefore, there is a material factual dispute regarding whether Decedent even had a gun in his hands at the time of the shooting, whether the muzzle of the gun ever came up in the direction of Dodge, including at the time of the shooting and whether Decedent's gun popped out he went down to the ground after the shooting.

There is also a material factual dispute as to whether Decedent "continued to keep his eyes on Sgt. Dodge." *See* Def.'s Motion at 11.  Both the video recording of the incident and the officers' testimony indicate that Decedent was looking in the direction of the unmarked van that pulled up as well as the SWAT members which were approaching him from both his right and left sides. [Ex. A – Video Recording of the Shooting at 13:39:13-13:39:30; Ex. B – Enhanced Video of the Shooting at 00:40-2:28; Ex. I – Matthews Int. at 10:4-16; Ex. J - Gruenther Int. at 26:2-6].  Therefore, there is a disputed issue of material fact whether Decedent continued to keep his eyes on Dodge from the time Dodge exited the van until the time of the shooting.

There is also a material factual dispute as to whether Decedent was backing away from Dodge upon Dodge exiting out of the van.  Defendant's Motion falsely claims that it is undisputed that Dodge exited out of the driver side door of the van and

that Decedent started backing away from Dodge.  See Def.'s Motion at 11.  However, a review of the video recording of the shooting clearly shows that Decedent never moved away from Dodge upon Dodge exiting out of the driver's side of the unmarked van and instead Decedent remained in the same general location near the front of the nearby white sedan upon Dodge exiting out of the van until the time of the shooting.  [Ex. A – Video Recording of the Shooting at 13:39:13-13:39:30; Ex. B – Enhanced Video of the Shooting at 00:40-2:28].

Apart from the so called "undisputed material facts" —which are highly disputed— included in Defendant's Motion, there are additional triable issues of material fact.  For example, there is a material factual dispute as to whether Dodge's primary assignment/responsibility, pursuant to the pre-designed tactical plan, was to drive the van and to be the less lethal option with the 40 mm gun, as opposed to being assigned as a primary lethal option and part of the primary contact team.  Defendant Dodge claims that he did not have an initial assignment and that none of the involved SWAT members, nor himself, had any primary responsibility pursuant to the pre-designed tactical plan.  [Ex. L – Dodge Depo. at 31-32].  Further, Dodge claims that there was no initial plan for him to come out of the unmarked van with the 40mm less lethal and that the 40mm was not his primary assignment.  [Ex. L – Dodge Depo. at 31-33].  However, in his initial interview Dodge admitted that he was assigned as the driver of the unmarked van and that Gruenther, Bollwahn, Matthews and Moen were the primary arrest team for Decedent pursuant to the pre-designed tactical plan.  [Ex. G – Dodge Int. at 18, 25].  Further, the involved SWAT members indicated that in initial

tactical plan everyone has primary tasks and that less lethal options are assignments, but that everyone has lethal capability.  [Ex. D - Moen Depo. at 99; Ex. H – Brown Depo. at 16].   Moreover, Dodge's primary assignment was to be the driver of the unmarked van and Dodge was assigned to the 40mm less than lethal pursuant to the tactical plan.  [Ex. H - Brown Depo. at 17; Ex. D – Moen Depo. at 43; Ex. K – Moen Int. at 17].  In this particular tactical plan called for the K-9 and the 40mm to be the less lethal options and the less lethal options are generally behind the lethal options.  [Ex. H – Brown Depo at 17; Ex. E – Bollwahn Depo. at 33-34, 41; Ex. D – Moen Depo. at 43].  Dodge deploying out of the van and straight towards Decedent was not part of the pre-designed tactical plan.  [Ex. D – Moen Depo. at 48].

Officer Brown's primary assignment was the K-9.  [Ex. H - Brown Depo. 15-16; Gruenther Depo. at 34; Ex. D – Moen Depo. at 42-43].   Further, pursuant to the tactical plan there were two 2 man teams whose primary assignment/responsibility was to make contact with Decedent.  [Ex. H - Brown Depo. at 16; Ex. E - Bollwhan Depo. at 31; Ex. C - Matthews Depo. at 90].   Officers Moen, Matthews, Bollwahn and Gruenther were the primary contact team in this operation, which were to deploy out of the van first, with Moen and Matthews making up one team and Bollwahn and Gruenther making up the other team.  [Ex. D - Moen Depo. at 42-43, 46; Ex. H – Brown Depo. at 16-17].  Officer Gruenther was one of the primary lethal options with his M-4 assault rifle and Officer Moen was the other primary lethal option.  [Ex. M - Gruenther Depo at 34; Ex. E - Bollwahn Depo. at 32; Ex. D - Moen Depo at 42].  Therefore, when the evidence is viewed in the light most favorable to Plaintiff and

taking all reasonable inferenced therefrom, there is a triable issue of material fact as to whether Dodge's primary assignment/responsibility, pursuant to the pre-designed tactical plan, was to drive the unmarked van and to be the less lethal option with the 40mm gun.

There is also a material factual dispute as to whether Decedent was standing upright for all of the shots and whether Decedent was facing in the direction of Dodge for all of the gunshots.  Dodge claims that Decedent did not have his back to Dodge during any of the shots and that Decedent was standing upright for all of the shots.  [Ex. C – Dodge Depo. at 47, 60].  However, one of the gunshots struck Decedent in his back,  another shot struck Decedent in the back of his elbow, and the third shot entered the right side of Decedent's chest in a right to left trajectory.  [Ex. N – Autopsy Report at 1, 5-6].  Decedent's back and the back of his elbow would have to be facing in the direction of the barrel of Dodge's gun in order for the bullets to have entered Decedent's back and the back of his elbow.  Further, the video recording of the shooting clearly shows that Decedent was going to the ground and already down on the ground for at least some of the gunshots.  [Ex. A – Video Recording of the Shooting at 13:39:13-13:39:30; Ex. B – Enhanced Video of the Shooting at 00:40-2:28].  Therefore, there is a triable issue of material fact as to whether Decedent was going to the ground or already on the ground for some of the gunshots and whether Decedent had his back to Dodge for some of the gunshots.

In light of the numerous disputed issues of material fact, there are also credibility issues that need to be taken into consideration by a jury.  Considering the

physical evidence together with the inconsistencies in the officer's testimony, a jury will have to make credibility judgments, and credibility determinations should not be made on summary judgment. *Pauly v. White*, 814 F.3d 1060, 1079-80 (10th Cir. 2016) (internal citations and quotations omitted); rev'd on other grounds, 137 S.Ct. 548 (2017). Moreover, since the victim of deadly force is unable to testify, courts should be cautious on summary judgment to ensure that the officer is not taking advantage of the fact that the witness most likely to contradict his story—the person shot dead—is unable to testify. *Id.* (quoting *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994)). As the Ninth Circuit noted in *Scott*, 39 F.3d at 915, the court may not simply accept what may be a self-serving account by the police officer. Rather, it must also look at the circumstantial evidence that, if believed, would tend to discredit the police officer's story, and consider whether this evidence could convince a rational factfinder that the officer acted unreasonably. *Pauly*, 814 F.3d at 1079-80 (internal citations omitted).

Since there are numerous triable issues of material fact Defendant's motion should be denied on this ground alone. See Fed. R. Civ. P. 56(c) (Summary judgment cannot be granted where a genuine dispute exists as to "material facts."). These disputed issues of material fact also preclude granting Dodge's request for qualified immunity. *See Carr v. Castle*, 337 F.3d 1221, 1228 (10th Cir. 2003) (It will be for the ultimate trier of fact to resolve which of the sharply disputed factual versions is to be credited, and hence whether the plaintiff's clearly established constitutional rights were or were not actually violated); see also *Coen v. Runner*, 854 F.2d 374, 377 (10th Cir. 1988) ("A defendant who makes such a showing of objective reasonableness is entitled

to summary judgment unless the plaintiff can demonstrate that there are factual disputes relevant to the defendant's claim to immunity."). "When the record shows an unresolved dispute of historical fact relevant to this immunity analysis, a motion for summary judgment based on qualified immunity should be 'properly denied.' " *See Olsen v. Layton Hills Mall,* 312 F.3d 1304, 1312 (10th Cir. 2002), citing *Salmon v. Schwarz*, 948 F.2d 1131, 1136 (10th Cir. 1991).

B. **The *Graham* and *Larsen* Factors:**

A.      The Severity of the Crime at Issue

Plaintiff does not dispute that the severity of the crime at issue was serious, but it was not violent. Decedent was purchasing multiple kilos of cocaine when he was killed and had previously sold assault weapons, including at least one fully automatic rifle, to the undercover officer. However, it should be noted that both of these crimes were non-violent felonies. The exchange of money for guns or drugs is not in it of itself a violent crime. At no point during this incident did Decedent ever attempt to injure or get violent with anyone, nor did Decedent ever injure or get violent during any of the previous transactions that Decedent had with the undercover officer. Further, Decedent never attempt to assault or rob any during this incident or during any of the previous transactions with the undercover. [Ex. L – Dodge Depo. at 55, 68; Ex M – Gruenther Depo. at 18; Ex. D – Moen Depo. at 57].

B.      Decedent Did Not Pose an Immediate Threat to the Safety of the Officers or Others

The second *Graham* factor is whether the suspect posed an immediate threat to the safety of the officers or others. *See Graham v. Connor*, 490 U.S. 386, 396 (1989).

"Whether the suspect poses an immediate threat to the safety of the officers or others" is the "most important and fact intensive factor in determining the objective reasonableness of an officer's use of force." *Pauly v. White*, 874 F.3d 1197, 1215-16 (10th Cir. 2017) (quoting *Graham*, 490 U.S. at 397). Based on the Tenth Circuit's guidance, where there are genuine issues of fact that must be resolved in order to determine whether a suspect posed an immediate threat to the safety of the officers or others, the second *Graham* factor will not weigh conclusively in the officer's favor. *See Pauly*, 874 F.3d at 1221. Here, Decedent did not pose an immediate threat to the safety of Dodge or anyone else. Decedent voluntarily discarded his gun onto the ground and complied with the officer's command to put his hands up prior to the shooting. When the evidence is viewed in the light most favorable to the Plaintiff and taking all reasonable inferences therefrom, prior to the shooting, Decedent voluntarily discarded his gun onto the ground and then put his visibly empty hands up near his head, in a universal sign of surrender, and was in this position when Dodge began firing at Decedent. Further, Dodge had cover from the car he was standing next to because a car's engine block can provide cover. [Ex. D – Moen Depo. at 97]. An individual who has his visibly empty hands up near his head, incompliance with the officer's command to do so, does not pose an immediate threat of death or serious bodily injury and does not pose a threat to the safety of the officers or others. [Ex. F - Clark Decl. at ¶ 15].

A reasonable officer under similar circumstances would not perceive that Decedent posed an immediate threat of death or serious bodily injury as demonstrated, at least circumstantially, by the fact that none of the other 5 SWAT team members fired

their weapons.  [Ex. F - Clark Decl. at ¶ 15].  The other involved SWAT team members, who were all armed and faced with similar circumstances that Dodge faced, including a similar distance to Decedent, never fired a shot despite having the opportunity to do so if they felt Decedent posed an immediate threat to their safety or the safety of others.  All of the SWAT members were armed with guns and some of them had them in their hands while others never even un-holstered them.  [Ex. L - Dodge Depo. at 30-31; Ex. H - Brown Depo. 41; Ex. E - Bollwahn Depo. at 42-44; Ex. M - Gruenther Depo. at 57].  When the evidence is viewed in the light most favorable to Plaintiff and taking all reasonable inferences therefrom, a reasonable officer under similar circumstances would have perceived that Decedent did not have a gun in his hand prior to the shooting, just as Officer Brown perceived.  [Ex. H – Brown Depo. at 14, 29].  Further, it would be unreasonable for Dodge to have mistaken that Decedent was armed at the time of the shooting.  *See Walker v. City of Orem*, 451 F.3d 1139, 1160 (10th Cir. 2006) (Although the officer stated he believed the suspect was pointing a gun at him, the belief was not reasonable when the facts are viewed in the nonmovant's favor).  A jury could rationally conclude a reasonable officer would have had time to see there was no gun in Decedent's hand and that he was not a threat at the time he was shot, including a shot to the back.  *See King v. Hill*, 615 F. Appx 470, 475 (10th Cir. 2015) (officers' mistaken belief that suspect was armed with a gun was not justified where facts viewed in plaintiff's favor indicated suspect's hands were visible); *see also Walker*, 451 F.3d at 1160 (under plaintiff's version of the facts, it was not reasonable for officer to believe suspect had a gun given the "angle of [suspect's] hands

and the amount of light on the scene").  Further, Decedent was not was not actively resisting arrest, and there was no need to use deadly force to prevent him from fleeing and possibly harming others.  *See Walker*, 451 F.3d at 1160.  Further, a reasonable jury could easily conclude that Decedent did not pose an immediate threat to the safety of the officers or others because Decedent had his visibly empty hands up near his head, indicating his surrender and in compliance with the officer's command to put his hands up, prior to the shooting and when the shooting began.  The evidence and reasonable inferences, when viewed in favor of Plaintiff, would establish that Decedent was unarmed at the time of the shooting, that both his hands were visible, and that he could not have been holding a gun.  *King*, 615 F. Appx at 475.

The involved SWAT team members, including Dodge, anticipated that Decedent may attempt to discard a gun because Valverde had indicated that he was armed during the prior transactions and that information was given during the briefing, so it should not have been a big surprise that Decedent might be armed and that he may attempt to discard his gun so as to avoid being caught with it.  In other words, it is not an uncommon for individuals with a gun to attempt to discard it so as to avoid being caught with it, and officers train for such an occurrence.  [Ex. E - Bollwahn Depo. 15-17, 22-24; Ex. C - Matthews Depo. at 29-30; Ex. M - Gruenther Depo. at 12-13, 19; Ex. D – Moen Depo. at 37, 40-41, 50-51].  Dodge has experience seeing individuals in the past discard weapons.  [Ex. L – Dodge Depo. at 35].  Further, SWAT members train in "shoot" and "don't shoot" scenarios and a person with empty hands in air would be a "don't shoot" scenario.  [Ex. E – Bollwahn Depo. at 18-19; Ex. D – Moen Depo. at 29].

Thus, a factfinder could conclude that a reasonable police officer seeing Decedent remove a gun from his person in an effort to discard it would be able to distinguish such action from a person intending to raise a gun and cause harm, and would not reasonably believe the suspect intended to threaten.

Even the involved officers, including Dodge, have indicated that Decedent would not be an immediate threat to the safety of the officers or others and that it would be inappropriate to shoot Decedent if he had discarded his gun onto the ground and put his empty hands up near his head. [Ex. L – Dodge Depo. at 36-37, 45-46; Ex. E - Bollwahn Depo. at 58-59; Ex. C – Matthews Depo. at 19-21; Ex. M - Gruenther Depo. at 76-77; Ex. D – Moen Depo. at 27-28, 73-74].

Contrary to Defendants' Motion (see pg. 16), Decedent did not resist arrest, Decedent did comply with the officer's command to put his hands up by putting his visibly empty hands up near his head after being commanded to do so, and Decedent did not back away from Dodge at any point after Dodge exited out the van. Further, Defendant argues that "it is undisputed that Sgt. Dodge observed Mr. Valverde reaching towards his pocket or waistband with his right hand." See Def.'s Mot. at 16. However, if Dodge saw Decedent reach into his pocket or waistband with his right hand and then saw a gun in Decedent's hand, then it is reasonable to infer that Dodge also saw Decedent discard his gun onto the ground and put his empty hands up near his head in compliance with the command to do so, because Decedent did this all in one motion prior to the shooting. In other words, there was not a pause between Decedent removing the gun from his shorts' pocket, voluntarily discarding his gun onto the

ground and putting his empty hands up near his head. Rather, teshe action were performed in one continuous motion and a reasonable jury could find that if Dodge saw Decedent remove a gun from his pockets or waistband and saw the gun in Decedent's right hand, then he also could see Decedent discard the gun onto the ground and put his empty hands up in the air in compliance with the officer's command to put his hands up.

Defendants also argue that Detective Rodriguez and Gruenther also witnessed Mr. Valverde pull the gun from his pocket and appear to rotate the muzzle in Sgt. Dodge's direction." *See* Def.'s Motion at 16. First off, the video indicates this never occurred and that instead Decedent removed his gun from his shorts' pocket and voluntarily discarded it onto the ground and put his hands up. Second, both Rodriguez and Gruenther had guns on them and if they did in fact However, this is not credible. First, the video demonstrates this never occurred and that instead Decedent removed his gun from his shorts' pocket and voluntarily discarded it onto the ground and put his hands up. Second, both Rodriguez and Gruenther had guns on them and if they did in fact see Valverde raise and point a gun they probably would have shot Decedent. Gruenther had his M-4 assault rifle in his hands and did not shoot and Rodriguez never even un-hostered his weapon. Third, Officer Brown saw that Decedent's right hand was empty when he was shot. [Ex. H. Brown Depo. at 14:6-11, 29:10-14]. This is confirmed by the video recording. Thus, reasonable jury could find that if Officer Brown could see that Decedent's right hand was empty at the time of the shooting, then Dodge should have been able to see that as well. Whether Gruenther and Rodriguez's

inaccurate statements were made to  try to help their fellow officer or they do not want to admit that an unarmed man was fatally shot as he tried to surrender during an operation that was created and put in motion by the police department—despite already having enough evidence on Decedent to put him away for decades for selling assault weapons to an undercover—and the negative public reaction that would follow, regardless, these are credibility issues and triable issues of material fact that must be decided by the jury.  In other words, credibility issues and disputed issues of material fact are within the exclusive province of the jury and not to be decided on a motion for summary judgment.

The evidence that Defendant relies on to argue that Decedent was an immediate threat to Dodge's safety at the time of the shooting is highly disputed.  Contrary to Defendant's Motion (see pg. 16-17), Dodge did not fire 5 shots in rapid succession as the Muzzle of Decedent's gun was coming in Dodge's direction.  Instead, when Dodge fired his 5 shots, Decedent had already discarded his gun onto the ground, and put his hands up in the air, in compliance with the command to do so and indicating his surrender, and Dodge shot Decedent while his hands were visibly empty and as Decedent went to the ground and was already on the ground, including two shots that struck Decedent from behind (one shot to the back and the other to the back of the elbow while Decedent was facing away from Dodge).  Because of the genuine issues of fact that must be resolved by a jury, the most important of the *Graham* factors does not weigh in Dodge's favor.  *See Pauly*, 874 F.3d at 1221.

Immediately after the shooting, Dodge was very emotionally distraught and

upset, and was pacing back and forth with his hands on his head.  [Ex. H – Brown Depo. at 39, 44-45].  In response, the involved officers told Dodge "don't be like that, that's the way it works, your fine, he wants to play the fucking game," and they said that "our bad guys dead," and then the undercover asked if Decedent died and the SWAT officer responded "well hell yeah," or words to that effect.  [Ex. A – Video Recording of Shooting at 13:41:11-22, 13:42:00-05].   When the evidence is viewed in the light most favorable to Plaintiff and taking all reasonable inferences therefrom, a jury could infer that Dodge was so distraught and upset immediately after the shooting because he knew that he just shot a man who had his empty hands up near his head, surrendering and complying with the officer's command to put his hands up.  In other words, a jury could find that Dodge's response immediately after the shooting was not that of an officer who just shot someone who was pointing a gun at them, as Dodge claims.

Defendant's reliance on the *Estate of Turnbow v. Ogden City*, 386 F. App'x 749 (10th Cir. 2010) (see Def.'s Mot. at 17), is misplaced and said case is highly factually distinguishable from the instant matter.  In the *Estate of Turnbow* "[t]he District Court held plaintiff failed to show a genuine dispute of material fact as to whether the officers had violated Mr. Turnbow's constitutional rights.  As such, the officers were entitled to qualified immunity and summary judgment was appropriate."  *Id*. at 750.  Whereas here, there are ample disputed issues of material fact regarding whether Dodge violated Decedent's constitutional rights, thus, making summary judgement inappropriate.  Additionally, in *Turnbow*, police had direct information that decedent matched the

description of a man who reportedly fired a shotgun in the air.  *Id*. at 750.  Then after seeing officers, decedent pulled the shotgun from his coat and went into a tactically defensive position behind a tree.  *Id*.  After seeing the gun in decedent's hand, officers gave specific commands to drop the gun, and in response decedent fired at officers.  *Id*.  Officers then repeated their commands moved to a position of cover and returned fire, which non-fatally impacted decedent.  *Id*. at 751.  Officers continued to give commands, and decedent fired on officers again.  *Id*.  Officers shot decedent, then decedent fell to the ground.  *Id*.  As officers approached, decedent grabbed for the shotgun and raised it towards the officers, and officers fired at decedent until he fell back.  *Id*.  Here, officers never told Decedent to drop the weapon, and most importantly, Decedent never fired on officers, twice, each time after ignoring police commands.  Instead, Decedent immediately disposed of the weapon in his possession in an effort to surrender to officer and comply with their commands to put his hands up.

Defendants' reliance on *Thomson v. Salt Lake Ctny*, 584 F.3d 1304 (10th Cir. 2009), to establish that Decedent was an immediate threat to the officer's safety (see Def.'s Mot. at 17) is equally misplaced and is greatly distinguishable from here as well. Unlike in *Thomas*, Decedent never threatened anybody, never pointed a gun at anybody, and did not refuse to drop the gun after being instructed by police.  *Id*. at 1309-10.  To the contrary, Decedent immediately voluntarily disregarded the weapon and put his hands in the air after receiving commands from the police.  Further, there police had information that Thomson was suicidal, thus officers were potentially concerned with suicide by cop.  *Id*. at 1310.  Additionally, Thomson threatened the

officer with force, warning them to be careful and that they should back off as they approached. *Id.* Thomson continued to threaten to shot officers, undisputedly pointed the weapon at officers, and then repeatedly ignored officer commands. Thereafter, Thomson was shot. Here it is undisputed that officers had no information regarding whether Decedent was suicidal, undisputed that Decedent never threatened to shoot officers, Decedent did not ignore commands, and Decedent never pointed a weapon at Dodge or anyone else.

Defendants' reliance on *Blossom v. Yarbrough*, 429 F.3d 963 (10th Cir. 2005) is also unpersuasive and greatly factually distinguishable from this matter. In *Blossom*, the suspect was 6'4", 265 lbs., and intoxicated, whereas the deputy was alone, 5'11" and 180 lbs., and knew that he could not detain the suspect without backup. *Id.* at 965. An officer approached, gave commands, and the suspect ignored the commands then forcibly grabbed the officer's vest. *Id.* After being pushed off, the suspect ran away and the officer saw a knife in the suspect's pocket. *Id.* When the officer approached, the suspect ran at the officer in full speed yelling threats at the officer, including threatening to take the officer's gun. *Id.* Still, the officer ran back and gave commands, and only after the suspect got close and reached for the officer's weapon did the officer fire. *Id.* There, the fact that the suspect was not yet armed was not outcome determinative because the suspect was attempting to arm himself by taking the officers weapon after threatening the officer's life. *Id.* at 968. Thus, the suspect was an immediate threat. However, here, Decedent made no threats, verbal or otherwise, complied with commands, did not flee, or attempt to grab the officer or his weapons

and Decedent was surrendering when shot.

Defendants' make repeated references to the Amended Complaint, and claim that "Plaintiff's version of events is clearly contradicted by the video and audio recording of the incident". *See* Def.'s Mot. at 18-19.  However, this is not a motion to dismiss, which creates confusion as to how or why references to the Amended Complaint would have any bearing on a motion for summary judgment, which is Further, the video evidence supports Plaintiff's version of the shooting and highly disputes Defendants' version of the shooting.  A reasonable jury who views the video recording could easily come to the conclusion that Decedent discarded the gun and put his hands in the air prior to the shooting in compliance with the command to do so and was surrendering when Dodge began to fire.  Accordingly, when the evidence is viewed in the light most favorable to Plaintiff and taking all reasonable inferences therefrom, Decedent was not an immediate threat to the safety of Dodge or others at the time of the shooting because he had already discarded his gun onto the ground and put his empty hands up in the air, in compliance with the command to show his hands and indicating his surrender.  Therefore, the most important of the *Graham* factors weighs heavily against the Defendant.

C.      Decedent was not actively Resisting Arrest and Did Not Attempt to Evade by Flight

Decedent was not actively resisting arrest during the incident, including at the time of the shooting.  To the contrary, Decedent complied with the officer's command to put his hands up and Decedent was surrendering at the time of the shooting.  Based on the video evidence alone, a reasonable jury could easily find that Decedent was not

actively resisting arrest and instead, was surrendering (and not resisting or evading) at the time of the shooting, especially when the evidence is viewed in the light most favorable to Plaintiff and taking all reasonable inferences therefrom.   Further, it is undisputed that Decedent never attempted to evade by flight.   Therefore, this factor also weighs heavily in favor of the Plaintiff.   In sum, an analysis of the *Graham* factors weighs heavily in favor of Plaintiff and heavily in favor of finding that Dodge's use of deadly force was unreasonable.

      D.     Dodge Did Not Give a Verbal Warning that Deadly Force Would be Used Prior to the Shooting Despite it Being Feasible to do so

It is undisputed that Dodge never gave Decedent a verbal warning that Deadly force would be used prior to the shooting.   It has long been established that, where feasible, a warning should be given prior to using deadly force to prevent the escape of a dangerous suspect.   *Thomson v. Salt Lake Cnty*, 584 F.3d 1304, 1321 (10th Cir. 2009); *see also Samuel v. City of Broken Arrow*, 506 F. Appx 751, 754 (10th Cir. 2012) (*quoting Garner*, 471 U.S. at 12) (The Tenth Circuit has noted that "it is clear that 'some warning' must be given before an officer uses deadly force if 'feasible.'")   Here, it was feasible for Dodge to give a verbal warning and a reasonable officer under similar circumstances would have given a verbal warning prior to shooting and would have found it feasible to do so.   [Ex. F – Clark Decl. at ¶ 16].   If the officers had time to give Decedent commands such as "put your hands up", to which Decedent complied, then Dodge had time to give a verbal warning that deadly force would be use prior to shooting.   [Ex. F – Clark Decl. at ¶ 17].   Further, it was feasible for Dodge to give a verbal warning because Decedent had discarded his gun onto the ground and raised his

empty hands in the air prior to the shooting.  In other words, a reasonable jury could find that it was feasible for Dodge to have given a verbal warning prior to the shooting, especially when the evidence is viewed in the light most favorable to Plaintiff and taking all reasonable inferences therefrom.  If Dodge "made the decision to use deadly force" (see Def.'s Mot. at 21) when he saw Decedent remove a gun from his right pocket, then he could have made the decision not to shoot because Decedent removed the gun from his shorts' pocket and discarded it onto the ground in one continuous motion.  In other words, if Dodge saw Decedent remove the gun, then it's reasonable to infer that he saw Decedent discard the gun on the ground, which all occurred in one single motion, and it would have been feasible to give a verbal warning under Plaintiff's facts.  Further, even assuming it would not have been feasible for the Dodge to give Decedent a warning in this situation, the facts as construed do not demonstrate deadly force was necessary to prevent serious physical harm or to prevent the escape of a suspect who had just committed a crime involving serious physical harm—the other necessary element before deadly force may be used.  *See Garner*, 471 U.S. at 11.

Defendant repeatedly attempts to argue that "the undisputed facts show that as Sgt. Dodge approached, Mr. Valverde was backing up" and that Decedent ignored commands to put his hands up.  *See* Def.'s Mot. at 22-23.  However, the video recording clearly shows that Decedent was never backing up as Dodge was approaching him and that Decedent did comply with the other officers' command to put his hands up by actually putting his hands up near his head prior to the shooting.  Moreover, contrary to Defendant's Motion, voluntarily discarding a gun onto the

ground and putting your empty hands in the air in compliance with the officer's command to do so, indicates Decedent's surrender, and does not constitute a "hostile motion".   *See* Def.'s Mot. at 22. Defendants would have been on notice of the difference between a discarding motion and a "hostile motion" as a result of their experience seeing individuals in the past discarding weapons so as not to be caught with them. Thus, factfinder could conclude that a reasonable police officer seeing Decedent removing a gun from his person to drop it would not believe he intended to cause harm in a hostile manner. Defendant also argues that Decedent's possible "intention to toss the gun aside" is speculation on behalf of the Plaintiff (see Def.'s Mot. at 22), as if Decedent may have intended to toss the gun but did not get the opportunity to do so prior to the shooting, (or at least that is what is implied).  Let's be very clear, there is no "speculation" about whether Decedent intended to toss his gun because Decedent manifestly *completed the action of tossing the gun* and raising his empty hand up near his head prior to the shooting; thus, a reasonable jury could easily reach this conclusion and conclude that Defendant Dodge was unreasonable for shooting him.

### ***Larsen* Factors**

The first *Larsen* factor is whether the officers ordered the suspect to drop his weapon, and the suspect's compliance with police commands.  *Estate of Larsen ex rel. Sturdivan v. MurrLarsen*, 511 F.3d 1255, 1260 (10th Cir. 2008).  Defendants' Motion conveniently omits the first portion of the first *Larsen* factor regarding whether the offices ordered the suspect to drop the gun.  This is most likely because neither Dodge,

nor any of the other involved SWAT members ever ordered Decedent to drop his gun, yet Decedent voluntarily dropped his gun onto the ground anyways and raised his hands in the air prior to the shooting.  [Ex. L – Dodge Depo. at 30, 42].  With regards to the suspect's compliance with police commands, it is undisputed that the officer's ordered Decedent to put his hands up, and that Decedent complied and put his hands up near his head prior to the shooting and was in this position when the shooting began. Accordingly, the first *Larsen* factor weighs heavily against the Defendant.

The second *Larsen* factor is whether any hostile motions were made with the weapon towards the officers.  *Larsen*, 511 F.3d at 1260.  Here, Decedent did not make any hostile motions with his gun.  Instead, Decedent voluntarily discarded his gun onto the ground then raised his hands in the air in one continuous motion, prior to the shooting.  A reasonable officer under similar circumstances would not find discarding a gun onto the ground then putting their empty hands up near their head as a hostile motion.  [Ex. F - Clark Decl. at ¶ 18].  Moreover, a reasonable jury could easily find that decedent did not make any hostile motions with his gun because he voluntarily discarded his gun onto the ground and put his empty hands up near his head prior to the shooting.  Therefore, the second Larsen factor weighs heavily against Defendant.

The third *Larsen* factor is the distance separating the officers and the suspect. *Id*.  Here, ten feet separated Dodge from Decedent.  See Def.s' Mot. at 23.  Further, there was a car between Dodge and Decedent which Dodge could have used the engine block as cover.  This factor also weighs in Plaintiff's favor because there were several feet between the two, including a car in between them that could be used as cover, and

Decedent had discarded his gun on the ground and raised his hands up near his head prior to the shooting, and was in this position when the shooting began.

The fourth and final *Larsen* factor is the manifest intentions of the suspect. *Id*. Here, the manifest intentions of the suspect were to surrender by voluntarily discarding his gun onto the ground, and to comply with the officer's command to put his hands up by raising his empty hands up near his head, indicating his surrender. At no point did Decedent try to resist the officers and he also never intended to evade arrest by flight. A suspect putting their empty hands up near their head is the universal signal to law enforcement that a suspect is surrendering and a reasonable officer under similar circumstances would have recognized that Decedent's manifest intention was to surrender. [Ex. F - Clark Decl. at ¶ 19]. When the evidence is viewed in the light most favorable to Plaintiff, and taking all reasonable inferences therefrom, a jury could easily find that Decedent's manifest intentions was to surrender and to comply with the officer's command to put his hands up. It is extremely difficult to imagine that a reasonable jury could find that Decedent's manifest intentions were to shoot the involved officers and that Decedent would have shot the involved officers had Dodge not killed him. Contrary to Defendant's Motion (see pg. 24), it was not only Decedent's subjective intention to discard the gun onto the ground; Decedent actually did in fact discard his gun onto the gun prior to the shooting. Decedent actually did in fact discard his gun onto the gun prior to the shooting. In other words, Decedent clearly intended to and actually completed the act of surrendering prior to the shooting.

In sum, an analysis of the *Larsen* factors weighs heavily in favor of finding that Dodge's use of deadly force against Decedent was unreasonable.

**Dodge Was Not in Danger at the Precise Moment that he used Deadly Force and Dodge's Own Reckless or Deliberate Conduct During the Seizure Created the need to Use Such Force**

Dodge was not in Danger at the precise moment that he used deadly force against Decedent because Decedent had already discarded his gun onto the ground and had his visibly empty hands up in the air in compliance with the officer's command to put his hands up and indicating his surrender, at the precise moment that Dodge began to shoot Decedent.  Based on the video recording of the shooting it is undisputed that Decedent had his empty hands up in the air near his head, in a universal position of surrender, when Dodge fired his first shot.  Further, it is also undisputed that the precise moment when some of the gunshots occurred Decedent's was going to the ground and already on the ground, including two shots to the back of Decedent's body (back and back of the elbow).  At the precise moment that Dodge shot Decedent multiple times, Dodge was not in danger from Decedent and a reasonable officer under similar circumstances would not believe that he was in Danger from Decedent at the precise moment of the shooting.  [Ex. F - Clark Decl. at ¶ 20].  A reasonable jury could easily find that Dodge was not in danger at the precise moment that he shot Decedent because Decedent had his empty hands up near his head surrendering at said moment.  In addition to not being in danger at the precise moment of the shooting, a reasonable jury could also find that Dodge's own reckless and/or deliberate conduct during the reverse drug bust unreasonably created the need to use deadly force against an individual with

his empty hands up near his head surrendering.  Tenth Circuit precedent recognizes that "[t]he reasonableness of the use of force depends not only on whether the officers were in danger at the precise moment that they used force, but also on whether the officers' own 'reckless or deliberate conduct during the seizure unreasonably created the need to use such force.'"  *Sevier v. City of Lawrence*, 60 F.3d 695, 699 (10th Cir. 1995).  The Court will "consider an officer's conduct prior to the suspect's threat of force if the conduct is 'immediately connected' to the suspect's threat of force."  *Allen v. Muskogee, Okl.*, 119 F.3d 837, 840 (10th Cir. 1997) (quoting *Romero v. Bd. of Cty. Comm'rs*, 60 F.3d 702, 705 n.5 (10th Cir. 1995)).  Dodge's own reckless and/or deliberate conduct during the operation which unreasonably created the need to use deadly force includes, but is not limited to, failing to identify him self as law enforcement prior to the shooting.  Dodge and the SWAT members arrived in an unmarked van and none of the involved SWAT members, including Dodge, identified themselves as law enforcement prior to the shooting.  [Ex. L – Dodge Depo. at 48-49]. The SWAT members were all wearing green uniforms, while your average patrol officer wears blue uniforms.  [Ex. L – Dodge Depo. at 67].  Further, a flash bang was deployed prior to the shooting which is designed to cause a diversion, to disorient, confuse, to surprise individuals and lose focus for 1-2 seconds, and are so loud that they can affect an individual's ability to hear.  [Ex. L – Dodge Depo. at 28, 57; Ex. H – Brown Depo. at 47-49; Ex. E – Bollwahn Depo. at 26-27; Ex. C – Matthews Depo. at 35-37; Ex. D – Moen Depo. at 15-16; Ex. F - Clark Decl. at ¶ 11].  In fact, SWAT members have the option of using earplugs that are provided so it will not impact their

hearing.  [Ex. H – Brown Depo. at 47-49].  Decedent flinched or jumped in reaction from the flash-bang and did not appear to know what was going on.  [Ex. C – Matthews Depo. at 115-16; Ex. D – Meon Depo. at 83-84].  Obviously Decedent did not believe that the undercover was a law enforcement officer and we know that Decedent did not know it was initially the police who were arriving in the unmarked van because the last words he ever spoke were "man who's that", to the undercover as the van pulled up and the officers deployed.  [Ex. A – Video Recording of the Shooting at 13:40:14-13:39:15].  Further, a witness who was walking her dog nearby at the time of the shooting and was in the background or backdrop, when the shooting occurred, also indicated that she did not know it was the police and thought that she was going to get shot because how they deployed out the unmarked van, they did not identify themselves as law enforcement, the green uniforms, and the flash bang.  [Ex. O – Sarah Fidler Written Statement at 1-2; Ex. P – Fidler Depo. at 68, 69, 75-76, 82-83, 99-104, 119]. Further, Dodge did not give any warning prior to using deadly force against Decedent and did not give him any commands such as drop it or drop the gun, prior to the shooting, despite it being feasible to do so.  [Ex. L – Dodge Depo. at 29-30, 42; Ex. F - Clark Decl. at ¶¶ 16-17].  Decedent, who had a large amount of cash in his backpack ($50,000), initially could have reasonably believed that he may be getting robbed, and may not have known that it was the police, just like the witness walking her dog did not know that it was the police.  A reasonable jury could find that deploying from and unmarked van, not identifying yourself as law enforcement, not giving a warning that deadly force will be used and not giving any commands to drop the gun, despite it

being feasible to do so, was reckless and/or deliberate conduct on behalf of Dodge that unreasonably escalated the situation to the point that Dodge erroneously believed that deadly force was required.

Dodge's own reckless and/or deliberate conduct during the operation which unreasonably created the need to use deadly force includes, but is not limited to, by failing to follow and completely discarding the pre-designed tactical plan. The SWAT members were briefed on the tactical plan and each SWAT member had their primary tasks/assignments. Moreover, Dodge was the acting supervisor during this operation and the plan was to get on top of Decedent quickly and surprise him. [Ex. L – Dodge Depo. at 65; Ex. E – Bollwahn Depo. at 35]. Further, the tactical plan is designed to help protect the involved officers, the suspect and the public as a whole. [Ex. F - Clark Decl. at ¶ 21]. Dodge's primary assignment/responsibility during the reverse drug buy was to drive the van and to be one of the less then lethal options with the 40 mm gun. The only two less lethal options, per the tactical plan, were Dodge with the 40 mm and Brown with his K-9. The less lethal options are usually positions behind the lethal options. Here, there were two, 2-man teams that were the primary contact officers. These, two 2-man teams, were going to deploy out of the van (after throwing a flash-bang device), with one team would deploy out of the side of the van and approach Decedent from his left side, while the other team would deploy out of the back of the van and approach from Decedent's right side, and the two teams would "pin" Decedent in. The front member of each of the two teams would be the primary lethal option, while the officer behind them would be more of the hands on officers. However,

instead of following the pre-designed tactical plan that all the SWAT members were briefed on, Dodge completely disregarded the tactical plan and deployed out of the unmarked van with his AR-15 assault rifle (that he brought from home) and left the 40 mm less lethal that he was assigned to inside of the van, and ran directly towards Decedent, putting himself in right in the middle of the two 2-man teams, and shot Decedent without ever identifying himself as law enforcement, without giving a verbal warning that deadly force would be used and without giving any command such as to drop the gun, while Decedent had his empty hands up near his head surrendering and in compliance with the command to put his hands up given by the other officer. The tactical plan was not for Dodge to exit out of the van and deploy directly towards Decedent.  [Ex. D – Moen Depo. at 48].  Further, Dodge never said that he was going to exit out of the van, or that he would be deploying out the van armed with his AR-15 assault rifle, instead of the 40mm less lethal per the tactical plan and he never gave any of the involved officers the "heads up" that he was going to use deadly force.  [Ex. H - Brown Depo. at 23, Ex. E –Bollwahn Depo. 52-53, 70-72; Ex. M – Gruenther Depo. at 60-61; Ex. D – Moen Depo. at 59-60, 78].  Moreover, because of Dodge's complete disregard of the tactical plan, many of the involved SWAT members had no idea that Dodge had even gotten out of the van and had no idea who was doing shooting because they did not see Dodge get out of the van.  [Ex. E –Bollwahn Depo. at 51-52; 70-72; Ex. C – Matthews Depo. at 119, 123-24, 127; Ex. M – Gruenther Depo. at 55, 60-61; Ex. D – Moen Depo. at 78].       Under these facts, a reasonable jury could easily find that Dodge was reckless in his pre-shooting conduct and may have precipitated the

mistaken belief that deadly force was needed.  In other words, a reasonable jury could find that had Dodge followed the tactical plan, Decedent would still be alive and Dodge would not have shot an unarmed man with his hands in the air surrendering and complying with the officer's command to do so.

When the evidence is viewed in the light most favorable to Plaintiff and taking all reasonable inferences therefrom, a jury could find that, under these facts, that Dodge inserted himself into a situation where he was more likely to misunderstand or erroneously perceive the need to use deadly force and where he was more likely to misinterpret Decedent's actions as threatening.  *See Sevier v. City of Lawrence*, 60 F.3d 695, 701 & n.10 (10th Cir. 1995) (noting that the district court may have denied summary judgment "on the finding that there was conflicting evidence as to whether the officers precipitated the use of deadly force by their own actions during the course of the encounter immediate prior to the shooting," including whether they acted recklessly in confronting the victim "without gathering more information on the situation").  A reasonable jury could find that under these facts Dodge's actions unreasonably escalated the situation to the point where he mistakenly felt that deadly force was required.

Although it was only a few seconds from the time that Dodge exited out of the van until the time of the shooting, "circumstances may change within seconds eliminating the justification for deadly force," and the Court must consider whether Dodge "could have reasonably perceived he was in danger at the precise moment that he used force."  *Thomas v. Durastanti*, 607 F.3d 655, 666 (10th Cir. 1995).

Accordingly, the Court should find a reasonable jury could conclude that the officer's actions were reckless and precipitated the mistaken belief that deadly force was needed. *Id*. Based on the record in the present case, viewed in the light most favorable to Plaintiff, Dodge did not have probable cause to believe there was an immediate threat of serious harm to himself or others. This is especially true considering Dodge may have participated in the reckless conduct that lead to his perceived need to shoot Decedent. Tenth Circuit precedent indicates that the "totality of the circumstances" embraces conduct "immediately connected with the seizure," such as conduct "arguably creating the need for force." *Holland ex rel. Overdorff v. Harrington*, 268 F.3d 1179, 1189 (10th Cir. 2001). Thus, Dodge's use of deadly force was not objectively reasonable and violated his constitutional right to be free from excessive force.

The question, here, is whether Defendant's conduct immediately prior to the shooting, such as failing to follow the tactical plan, shooting Decedent with out ever identifying himself as law enforcement, without ever giving a warning or a command, was reckless in a way that created the mistaken need to use deadly force. Because a reasonable jury could accept that view of Defendant's conduct, a question remains as to whether Defendant unreasonably created the mistaken need to use force.

Element 2: Clearly Established Law Put Dodge on Sufficient Notice that His Use of Deadly Force was Unlawful.

First off, Dodge is not entitled to qualified immunity because there are disputed issues of material fact that first must be resolved by the jury. *See Carr*, 337 F.3d at 1228; *see also Coen*, 854 F.2d at 377; *Olsen*, 312 F.3d at 1312. Accordingly, Dodge's

request for qualified immunity should be denied on this ground alone.

Second, when Dodge shot Decedent on July 2, 2014, the law was clearly established and Dodge was on sufficient notice that it would be unlawful to shoot an individual who had voluntarily discarded his gun onto the ground and had his visibly empty hands up near his head, indicating his surrender and in compliance with the officer's command to put his hands up, at the time of the shooting.  In other words, it is obviously unlawful to shoot an individual who has their visibly empty hands up near their head, indicating their surrender and in compliance with the office's command to put his hands up and Plaintiff does not need a case with identical facts to establish that said use of deadly force would be unlawful.  The Supreme Court or Tenth Circuit authority need not be square on all four corners, *see Anderson*, 483 U.S. at 640, and "a plaintiff need not present an identical case to show the law was clearly established." *Sutton*, 173 F.3d at 1241.  A case with "exact corresponding factual circumstances" is not necessary; defendants are required to make "reasonable applications of the prevailing law to their own circumstances."   *Currier*, 242 F.3d at 923 (internal quotation marks omitted); *see also Morris*, 672 F.3d at 1196 (acknowledging that a plaintiff's right to be free from excessive force may be clearly established even in the absence of prior similar case law if the plaintiff makes a showing that the conduct was "obviously egregious ... in light of prevailing constitutional principles").  Here, when Dodge shot Decedent back in July of 2014, it would have been obvious to him that it was unlawful to shoot an unarmed individual who had voluntarily discarded his gun onto the ground prior to the shooting, and who had his empty hands up near his head,

surrendering and in compliance with the officer's command to put his hand up. Further, in determining whether Dodge is entitled to qualified immunity, Plaintiff's facts are assumed to be true. *See Tolan*, 134 S.Ct. at 1866; see also *Thomas*, 584 F.3d at 1318. Therefore, in conducting the qualified immunity analysis, the Court must assume that it is true that Decedent discarded his gun onto the ground, and put his empty hands up near his head, in compliance with the officer's command to put his hands up, and the Court cannot credit Defendant's version of the shooting which is contradicted by the evidence, especially the video recording of the shooting. It would be obvious to a reasonable officer under similar circumstances that it would be unconstitutional to shoot an individual who voluntarily discards his gun onto the ground and puts his empty hands up near his head, indicating his surrender and in compliance with the officer's command to put his hands up. It is not necessary for the precise conduct of Dodge to have been previously held unlawful and preexisting law gave Dodge fair warning that his conduct violated the law. *See Hope*, 536 U.S. at 741 (stating "officials can still be on notice that their conduct violates established law even in novel factual circumstances;" while "earlier cases involving fundamentally similar facts can provide especially strong support for a conclusion that the law is clearly established, they are not necessary to such a finding").

Assuming Plaintiff's facts to be true for purposes of the qualified immunity analysis, Dodge shot Decedent after Decedent had voluntarily discarded his gun on to the ground and put his visibly empty hands up near his head, surrendering and in compliance with the officer's command to put his hands up. Under these

circumstances, Dodge's use of deadly force against Decedent was extremely egregious. In other words, it is extremely egregious to shoot an individual who is surrendering and who is complying with the officer's command to show his hands.  Although alleged rights violations must be analyzed at the proper level of generality, based the sliding scale adopted by the Tenth Circuit "[t]he more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation." *Pierce*, 359 F.3d at 1298.  Therefore, far less specificity is required from prior case law to establish the violation of Decedent's rights and none of the cases cited by Plaintiff need to pertain to the exact same factual situation as Defendant faced on July 2, 2014.  The Court should still concludes that Supreme Court and Tenth Circuit precedent establish that Defendavidnt's actions— viewed in a light most favorable to Plaintiff—violated Plaintiff's Fourth Amendment rights.  A court decision with "identical facts" is not required to "establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself." *Weigel v. Broad*, 544 F.3d 1143, 1154 (10th Cir. 2008).  Given Plaintiff's facts, a reasonable jury could conclude that it was totally unnecessary to use deadly force to restraint Decedent or to protect officers and the public.  Under at least one view of the facts that a reasonable jury could adopt, Defendant violated a clearly established right. There may be other interpretations that a jury could accept, some of which might entitle Defendant to qualified immunity and others which would not.  The Court's task at this summary judgment phase is only to determine whether there is any reasonable interpretation of

the evidence that would deprive Defendant of the defense of qualified immunity.  Here, such an interpretation exists, and so the Court should not rule as a matter of law before trial that Defendant is immune from suit.  *See Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (acknowledging that a plaintiff's right to be free from excessive force may be clearly established even in the absence of prior similar case law if the plaintiff makes a showing that the conduct was "obviously egregious ... in light of prevailing constitutional principles").  Summary judgment on qualified immunity grounds would therefore be inappropriate.

Genuine questions of material facts exist as to whether Dodge was in danger at the moment he shot Decedent and whether he acted recklessly, unreasonably, and deliberately during the events surrounding Decedent's seizure and that this conduct immediately led to the shooting.  The remainder of the facts—whether Dodge shot without warning, whether Dodge and the involved SWAT members ever announced themselves as officers, whether Decedent complied with the commands to put his hands in the air, whether Decedent ever pointed his gun and whether his empty hands were up near his head at the time of the shooting are very much in dispute. There is conflicting evidence as to whether Dodge's reckless or deliberate actions caused his use of deadly force.  Viewing the facts in a light most favorable to Plaintiffs, the Court should find and conclude that there are material questions of fact as to whether a Fourth Amendment excessive force violation occurred here.  In the more obviously egregious specific context of this case, the law regarding excessive force is clearly established. *See  Hill  v.  Martinez*, 87  F.Supp.2d  1115,  1128  (D.Colo.  2000),  citing  *Pueblo*

*Neighborhood Health Centers, Inc. v. Losavio*, 847 F.2d 642, 645-46 (10th Cir. 1988); *See also Carr*, 337 F.3d at 1227, *citing Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) (Where the suspect poses no immediate threat to the officer and no threat to others the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.... A police officer may not seize an unarmed, non-dangerous suspect by shooting him dead.). It is not necessary for there to be specific case law for every factual situation that may arise. A reasonable officer in Dodge's position was on notice that his actions violated Decedent's Fourth Amendment rights. At the time Dodge shot Decedent, the law was clearly established that a law enforcement officer may not use deadly force to seize an unarmed person who is not posing any threat to the officer or others. *See Garner*, 471 U.S. at 11 ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead"); *see also Walker*, 451 F.3d at 1159-60 (10th Cir. 2006) (deadly force is justified if a reasonable officer in the defendant's position would have had probable cause to believe there was a threat of serious physical harm to the officer or others); *see also Weigel*, 544 F.3d at 1154 ("We do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself").

According to Plaintiff's evidence, Dodge exited his vehicle with his weapon already drawn and proceeded to a position near the front of the car that Decedent was standing next to without identifying himself as a police officer or, indeed, saying anything at all. *See Zia Trust co. ex rel. Causey v. Montoya*, 597 F.3d 1150, 1154-55

(10th Cir. 2010).  It is unclear, at least under the Plaintiff's facts, whether Decedent even initially knew that Dodge was an officer was a police officer.  *Id*.  It is not clear that Decedent manifested an intent to harm Dodge or anyone else at the scene.  *Id*. at 1155.  In *Zia Trust*, the court held that they "do not think it requires a court decision with identical facts to establish clearly that it is unreasonable to use deadly force when the force is totally unnecessary to restrain a suspect or to protect officers, the public, or the suspect himself." *Id*. at 1155 (internal citations and quotations omitted).  The evidence and reasonable inferences, when viewed in favor of Plaintiff, would establish that Decedent was unarmed at the time of the shooting that both of his hands were visible, and Decedent could not have been holding a gun.  *King v. Hill*, 615 F. Appx 470, 475 (10th Cir. 2015).  Under these facts, there does not need to be a case directly on point to put Dodge on fair notice that his use of deadly force would be unconstitutional.  Such a shooting would obviously be extremely egregious and it would have been obvious to a reasonable officer under similar circumstances that such a use of deadly force would be unlawful.  Plaintiff has located no case in which a citizen putting his empty hands up in the air, in compliance with the officer's command to put his hands up and indicating his surrender, had deadly force used against him, all without warning, commands or even identifying himself as being law enforcement.  But we need not have decided a case involving similar facts to say that no reasonable officer could believe that he was entitled to behave as Dodge did.  *Graham* establishes that force is least justified against nonviolent individuals who do not flee or actively resist arrest.  *See Casey v. City of Federal Heights*, 509 F.3d 1278, 1285 (10th Cir.

2007), *citing Graham*, 490 U.S. at 396.

The fact that a suspect is armed with a deadly weapon "does not render the officers' response per se reasonable under the Fourth Amendment." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013). Discarding a gun onto the ground and putting your empty hands in the air, in one continuous motion, in compliance with the command to do so and in surrender, is not a furtive movement or harrowing gesture. Even having a gun in your hand is not in it of itself a dangerously furtive movement; rather, "[i]f the person is armed—or reasonably suspected of being armed—a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat." *Id* at 838; *See also Curnow v. Ridgecrest*, 952 F.2d 321, 325 (9th Cir. 1991) (Holding that under Plaintiff's version of the shooting, the police officers could not reasonably have believed the use of deadly force was lawful because Curnow did not point the gun at the officers and apparently was not facing them when they shot him the first time); *see also Hopkins v. Andaya*, 958 F.2d 881, 886-87 (Finding that they could not say as a matter of law that the officer acted reasonably when he shot decedent and that the officer was not entitled to qualified immunity, even though Decedent was shot after attacking the officer with a club, then later after discarding the club, and once again approached the officer). Accordingly, the weight of authority from Ninth Circuit precedent would also have put Dodge on fair notice that his use of deadly force was unlawful, despite Decedent previously being armed with a gun, prior to the shooting.

The weight of authority from other courts also confirms that merely being armed with a weapon, without pointing or otherwise threatening someone with that

weapon, does not reasonably justify a shooting. *See Lundgren v. McDaniel*, 814 F.2d 600 (11th Cir. 1987) (denying qualified immunity where there was no dispute the decedent had a weapon, but a factual dispute existed about whether decedent had fired); *Compar*e *Perez v. Suszczynski*, 809 F.3d 1213 (11th Cir. 2016) (stating that presence of a deadly weapon alone is not enough to establish a deadly threat, questions pertaining to "where the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination"); *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996) (denying qualified immunity where suspect had a gun, but a factual disputes arose about what was being done with the gun at the time the officer fired on him); *Brandenburg v. Cureton*, 882 F.2d 211 (6th Cir. 1989) (denying qualified immunity where suspect had fired warning shots in the air, and had put rifle on ground when police told him not to pick up rifle, but factual dispute arose about whether suspect was picking up rifle again and/or aiming at police at the time of the shooting); *Cooper v. Sheehan*, 735 F.3d 153 (4th Cir. 2013) (concluding officer unreasonable where he shot man holding a shotgun in a lowered position and the man did not threaten anyone with the weapon); *Bennett ex rel. Estate of Bennett v. Murphy*, 120 Fed.Appx. 914 (3d Cir. Jan. 14, 2005) ("although refusing to drop his weapon over the course of an hour-long standoff, had never pointed his single-shot shotgun at anyone but himself and was not in flight at the time he was shot"). This is especially true when the manifest intentions of a suspect are to surrender. *See Jamison v. Metz,* 541 Fed. Appx. 15 (2nd Cir. Sept. 12, 2013) (concluding that police acted unreasonably in shooting a man that held a gun, after he had stopped and was "in an act of

surrendering," without warning); *Hemphill v. Schott,* 141 F.3d 412 (2nd Cir. 1998) (concluding conduct in shooting a suspect who had stopped and raised his arms in the air when commanded, even though the suspect was armed and had committed violent crimes).

Given the existing precedent, it would be fair to say that Defendant was on notice that it was unlawful for him to use deadly force against Decedent, when he did, if the facts of the situation were as Plaintiff asserts.  In other words, on the date of the incident, precedent clearly establish that a reasonable officer in Dodge's circumstances would have understood that an officer could not shoot an unarmed man who was not threatening the officers.  In sum, on the date of the incident, the law was clearly established and Dodge was on fair notice, that it would be unconstitutional to shoot an individual who voluntarily discarded his gun onto the ground had put his visibly empty hands up near his head, surrendering and in compliance with the officer's command to put his hands up.

## CONCLUSION

For the foregoing reasons, Defendant Dodge is not entitled to qualified immunity and Defendants' Motion for Summary Judgment should be denied in its entirety.

Respectfully submitted this 25th day of March, 2016.

COUNSEL FOR PLAINTIFF

*s/    Raymond K. Bryant*
Raymond K. Bryant
Civil Rights Litigation Group, PLLC

1391 Speer Blvd., Suite 705
Denver, CO 80204
P:  720-515-6165
F:  303-416-4246
Raymond@rightslitigation.com


*s/    Eric Valenzuela*
Law Offices of Dale K. Galipo
21800 Burbank Blvd., Suite 310
Woodland Hills, CA 91367
P:  818-347-3333
F:  818-347-4118
evalenzuela@galipolaw.com


## CERTIFICATE OF SERVICE

I certify that on this 17th day of November, 2016, the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was filed with the Clerk of the Court via the CM/ECF system, which will send notification of such filing to the following:

Wendy J. Shea
Conor D. Farley
Jamesy C. Owen
Assistant City Attorneys
Denver City Attorney's Office
Litigation Section
201 West Colfax Ave., Dept. 1108
Denver, Colorado 80202
Telephone: (720) 913-3100
Facsimile:  (720) 913-3131
E-mail:     wendy.shea@denvergov.org
            conor.farley@denvergov.org
            jamesy.owen@denvergov.org


s/ Raymond K. Bryant_____